[Crim. No. 7646.   In Bank.   Oct. 1, 1965.]

THE PEOPLE, Plaintiff and Respondent, v. RICHARD PRICE, Defendant and Appellant.

William O. Weissich, under appointment by the Supreme Court, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, Albert W. Harris, Jr., and John F. Kraetzer, Deputy Attorneys General, for Plaintiff and Respondent.

PEEK, J.—Richard Price was charged by indictment in Count I with the murder of Charles Sorensen, in Count II with the murder of Hale Humphrey, in Count III with robbery committed against Charles Sorensen, and in Counts IV and V with auto thefts. He was found guilty by a jury of the crimes charged in Counts, I, II, IV and V and of grand theft of a pistol, a lesser included offense, as to Count III. The murders were found to be of the first degree.

The jury further found, on defendant's plea of not guilty by reason of insanity, that he was sane at the times of the commissions of the offenses of which he stood convicted.

On the penalty phase in connection with the first degree murder verdicts the jury fixed punishment at death as to each conviction. The appeal is automatic pursuant to section 1239, subdivision (b), of the Penal Code. On March 15, 1963, defendant, then not yet 19 years of age, accompanied by a juvenile, Jack Sikes, entered a service station in the City of Lodi, shot a customer in the leg, and drove off with a Dodge automobile belonging to the station owner. The California Highway Patrol was immediately notified, and Officer Charles Sorensen answered the call. He pursued defendant and his accomplice on Highway 12 at speeds of 85 to 90 miles per hour. During the chase defendant shot at automobiles passing in the opposite direction, apparently hoping to cause an accident and thereby halt Sorensen's pursuit. In Rio Vista defendant crashed the Dodge, and with his accomplice fled on foot through a gate and around the side of a vacant house. Officer Sorensen followed on foot and as he passed through the gate and around the corner of the house defendant fired two shots at close range, killing the officer instantly.

Defendant then procured the officer's pistol and with his accomplice took the patrol car and continued west on Highway 12. Deputy Sheriff Hale Humphrey and others, having been alerted, set up a road block of vehicles across the highway. Defendant deliberately drove the patrol car at a speed estimated to have been in excess of 100 miles per hour into the vehicles blocking the road, causing the death of Humphrey.

The defendant does not question the sufficiency of the evidence to support the verdict as to each of the crimes of which he stands convicted. It is argued, however, that the judgment must be reversed because the court erred prejudicially: (1) in giving some and refusing to give other instructions, (2) in denying a motion for a change of venue, (3) in commenting and allowing the district attorney to comment upon defendant's failure to testify in his own behalf, (4) in receiving into evidence certain incriminating statements made by defendant in the absence of counsel and without apprising defendant of his rights, and (5) in instructing and allowing evidence and argument on the penalty phase concerning the possibility of parole in the event defendant was sentenced to life imprisonment.

The prosecution takes issue with each of defendant's contentions, except the charged impropriety of the testimony, instructions and argument relative to the possibility of parole. In this connection the state, with commendable forthrightness, concedes that the proceedings contravened the rules later announced by this court in *People* v. *Morse,* 60 Cal.2d 631 [36 Cal.Rptr. 201, 388 P.2d 33]. The state's contention that the error was not prejudicial, however, fails to meet the test of *People* v. *Hamilton,* 60 Cal.2d 105 [32 Cal.Rptr. 4, 383 P.2d 412], wherein we held at page 137 that ''any substantial error occurring during the penalty phase of the trial, that results in the death penalty, since it reasonably may have swayed a juror, must be deemed to have been prejudicial.'' (See also *People* v. *Hines,* 61 Cal.2d 164 [37 Cal.Rptr. 622, 390 P.2d 398].) A reversal on the penalty phase is thus indicated. However, we find further merit in defendant's fourth contention and have concluded that the judgment must be reversed on the guilt phase as well due to the reception into evidence of incriminating statements clearly within the scope of those later denounced by this court in *People* v. *Dorado,* 62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361]. Accordingly, only brief comment need be made as to defendant's three remaining contentions.

374

■ Defendant's initial contention is that the court erred in failing to instruct on its own motion that where the People's case rests substantially on circumstantial evidence the circumstances must be entirely consistent with guilt and inconsistent with any other conclusion. However, where as here the People's case rests chiefly on direct evidence, such an instruction is not necessary. (See *People* v. *Malbrough*, 55 Cal.2d 249 [10 Cal. Rptr. 632, 359 P.2d 30].) Without recounting the evidence in detail suffice to say that there is more than sufficient direct evidence as to each of the crimes of which defendant was convicted aside from the statements improperly received into evidence. Thus, the instruction on circumstantial evidence, which defendant did not request, was not required. (*People* v. *Gould*, 54 Cal.2d 621 [7 Cal.Rptr. 273, 354 P.2d 865]; *People* v. *Zurica*, 225 Cal.App.2d 25 [37 Cal.Rptr. 118].)

■ A further claim of error in instructions is made in connection with the court's definition of "malice" in the language of section 7, subdivision 4, of the Penal Code,[1] as applied to the crime of murder. The court also instructed in the language of section 188 of the Penal Code.[2]

Instructions in the language of both sections do not, without more, constitute prejudicial error. (*People* v. *Gorshen*, 51 Cal.2d 716 [336 P.2d 492]; *People* v. *Chavez*, 37 Cal.2d 656 [234 P.2d 632]; *People* v. *Harris*, 169 Cal. 53 [145 P. 520]; *People* v. *Dice*, 120 Cal. 189 [52 P. 477]; *People* v. *Waysman*, 1 Cal.App. 246 [81 P. 1087].) No specific claim of prejudice is made and none is apparent in the instant circumstances. Moreover, it appears that defendant himself requested the instruction in the language of section 7, subdivision 4, and any error which may have resulted must be deemed to have been invited.

The denial of defendant's motion for change of venue, also urged as a ground for reversal, is predicated upon claimed undue television and other publicity throughout the county which is further claimed to have made it improbable, if not impossible to impanel an objective jury in the county. Because

[1]Section 7, subdivision 4, provides: "The words, 'malice' and 'maliciously' import a wish to vex, annoy, or injure another person, or an intent to do a wrongful act, established either by proof or presumption of law."

[2]Section 188 provides: "Such malice may be express or implied. It is express when there is manifested a deliberate intention unlawfully to take away the life of a fellow-creature. It is implied, when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart."

these claimed circumstances will, in all likelihood, not continue to prevail upon retrial, no useful purpose will be served by comment at this time.

■ Defendant's third contention, that comments on his failure to testify in his own behalf fall within the proscription against self-incrimination prohibited by the Fifth and Fourteenth Amendments, now appears to be well taken. Recent decisions of the United States Supreme Court, filed during the pendency of the instant appeal, are in accord (*Malloy* v. *Hogan*, 378 U.S. 1 [84 S.Ct. 1489, 12 L.Ed.2d 653]), even in those situations where the comments are confined within the limits established in section 13 of article I of the California Constitution (*Griffin* v. *California*, 380 U.S. 609 [85 S.Ct. 1229, 14 L.Ed.2d 106]). The further question whether the error was prejudicial within the meaning of section 4½ of article VI of our state Constitution or *Fahy* v. *Connecticut*, 375 U.S. 85 [84 S.Ct. 229, 11 L.Ed.2d 171], and for that reason requires a reversal, need not be resolved at this time (see *People* v. *Bostick*, 62 Cal.2d 820 [44 Cal.Rptr. 649, 402 P.2d 529]) as the judgment must be reversed for the independent reasons heretofore mentioned and presumably the error will not recur on any retrial.

Defendant's remaining contention, that reversible error resulted from the admission, over objections, of certain incriminating statements made by him prior to the time he was represented by counsel or advised as to his rights in connection therewith, requires exposition of the circumstances under which the statements were made.

Following the crash into the roadblock on March 15 defendant was treated for his injuries, placed in a body cast and, while under arrest, confined to a hospital detention room. The indictment was returned on March 21 and defendant was arraigned on March 25, 1963. Counsel was appointed on that latter date.

Three statements were made by defendant and recorded prior to his arraignment and the appointment of counsel. The first, made on March 18 while defendant was confined to the hospital, was a detailed statement solicited by and given to the district attorney. This statement, which was recorded in shorthand and later transcribed and read into the record, was an unequivocal recital of acts which would compel the finding of guilt as to each of the crimes charged. Defendant was not advised of his right to counsel or of his rights generally other than by an admonition to the effect that he could

expect no leniency and that his statements could be used against him.

A second statement was taken by the district attorney on March 25 before the appointment of counsel on that date. This statement was made while defendant was in an ambulance waiting to be brought into the courthouse for arraignment. Again the record shows that defendant was not advised of any of his rights or otherwise admonished in any manner. The statement generally expanded upon the earlier statement concerning the events which had transpired at the service station in Lodi. As before, the statement was recorded in shorthand, transcribed and read into the record at the trial.

The third statement was given to a television news reporter who, prior to the interview, sought and obtained permission from the officer exercising custody over defendant while he was confined to the hospital. Other than granting the initial request for the interview the police did not participate in any manner whatever. While the statement might be said to constitute a general acknowledgment of some guilt, it did not specifically relate defendant's actions which constitute the crimes charged. The interview was recorded on a motion picture sound film which was used by the reporter as a television news item and, over objections, was exhibited to and heard by the jury.

In addition to the foregoing three occasions on which defendant's statements were solicited and recorded in some form, defendant made other statements after the appointment of counsel and before the commencement of trial on the 13th of August, 1963. Such further statements were made to three court-appointed alienists who interviewed the defendant in the course of their psychiatric examinations upon defendant's plea of not guilty by reason of insanity. (Pen. Code, § 1027.) Although defendant's counsel had directed a written request to the court and to the district attorney that he be notified of the time or times of the examinations, the interviews were conducted without notification or knowledge of counsel. Each of the psychiatrists was called by the People to testify on the guilt phase, and in each case was examined extensively as to whether in his opinion the defendant had the necessary mental capacity to premeditate the killing of another human being at the times charged in Counts I and II of the indictment. In some instances on both direct and cross-examination the expert was asked as to the basis for his opinion, and in reply thereto made references to statements of an incriminating nature which defendant had related during the psychiatric

examination. Specific objections were not made in these instances, but a general motion to strike the experts' testimony was denied on the ground that the statements by defendant were merely cumulative to his earlier statements to the district attorney. The case was tried prior to our initial opinion in *People* v. *Dorado* (Cal.) 40 Cal.Rptr. 264, 394 P.2d 952.

Defendant claims that not only the three recorded statements but also his statements testified to by the psychiatrists fall within the proscription of *People* v. *Dorado, supra,* 62 Cal.2d 338, 353-354. We held in that case: ". . . that defendant's confession could not properly be introduced into evidence because (1) the investigation was no longer a general inquiry into an unsolved crime but had begun to focus on a particular suspect, (2) the suspect was in custody, (3) the authorities had carried out a process of interrogations that lent itself to eliciting incriminating statements, and (4) the authorities had not effectively informed defendant of his right to counsel or of his absolute right to remain silent, and no evidence establishes that he had waived these rights."

█ It is manifest in the instant case that defendant's first two statements, which were directly solicited by the district attorney, fall squarely within that class of statement which comes within the proscription of *Dorado,* which was predicated upon the prior decisions of the United States Supreme Court in *Massiah* v. *United States,* 377 U.S. 201 [84 S.Ct. 1199, 12 L.Ed.2d 246], and *Escobedo* v. *Illinois,* 378 U.S. 478 [84 S.Ct. 1758, 12 L.Ed.2d 977]. The admission of those statements resulted in a denial of due process that compels reversal in the instant circumstances. █ "[T]he view that even if the testimony as to the petitioner's confession was erroneously admitted, the error was a harmless one . . . is an impermissible doctrine. As was said in *Payne* v. *Arkansas,* [356 U.S. 560 (78 S.Ct. 844, 2 L.Ed.2d 975)] 'this Court has uniformly held that even though there may have been sufficient evidence, apart from the coerced confession, to support a judgment of conviction, the admission in evidence, over objection, of the coerced confession vitiates the judgment because it violates the Due Process Clause of the Fourteenth Amendment.' [Citations.]" (*Lynumn* v. *Illinois,* 372 U.S. 528, 537 [83 S.Ct. 917, 9 L.Ed.2d 922].) While in the *Lynumn* case the Supreme Court had before it a coerced confession, we are persuaded that the same rule applies with respect to the admission of confessions obtained in violation of *Massiah* and *Escobedo,* at least when the admissible evidence does not include an equally damaging confession.

Although the improper admission of the two statements requires that we reverse the judgment without looking to the error, if any, in the admission of other statements, it nevertheless appears that comment as to the admissibility of the other statements is indicated. While it may be presumed that upon retrial the statements solicited by the district attorney will not again be offered by the People, nothing we have said will aid the court in determining the admissibility on the guilt phase of statements made by defendant to the reporter or to the court-appointed psychiatrists.

■ Our decision in *Dorado* cannot be construed as a general prohibition against the admission into evidence of incriminating statements made by one suspected or accused of a crime upon a prosecution therefor. The prohibition is directed against procedures which deny to a suspect or an accused due process of law: " 'So long as the methods used comply with due process standards, it is in the public interest for the police to encourage confessions and admissions during interrogation.' " (*People* v. *Dorado, supra,* 62 Cal.2d at p. 354, quoting from *People* v. *Garner,* 57 Cal.2d 135, 164 [18 Cal.Rptr. 40, 367 P.2d 680].)

Thus denials of due process in *Massiah, Escobedo,* and *Dorado* are not based on the fact that counsel was not present at the time the suspect made incriminating statements, but on a combination of circumstances, one of which was the absence of counsel. Foremost of such circumstances is that the police had "carried out a process of interrogations that lent itself to eliciting incriminating statements." (*People* v. *Dorado, supra,* 62 Cal.2d at pp. 353-354.) In *Massiah* the reversal by the United States Supreme Court was required because there was introduced at defendant's trial evidence of his own incriminating words, "which federal agents had deliberately elicited from him . . ." in the absence of admonitions or counsel. (*Massiah* v. *United States, supra,* 377 U.S. 201, 206.) And in *Escobedo* the Supreme Court held that "where as here . . . the police carry out a process of interrogations that lends itself to eliciting incriminating statements" together with the other circumstances constituting a denial of due process "no statement elicited by the police during the interrogation may be used against him at a criminal trial." (*Escobedo* v. *Illinois, supra,* 378 U.S. 478, 490-491.)

■ It is apparent from the foregoing that the basis for the prohibition against the use of incriminating statements is police action which results in a violation of one's constitutional rights guaranteed by due process.

█ As we have noted the statement made by defendant to the reporter was in no way the result of police interrogation but was wholly voluntary, and hence no reason appears for excluding it.

In *Massiah* the statements were excluded upon a showing that police had prevailed upon the defendant's partner in crime to engage defendant in a discussion of the accusations while they sat in an automobile containing a radio device which transmitted the conversation to police officers nearby. The record in the case before us does not permit a conclusion that the private reporter was acting in any respect on behalf of or as an agent for the prosecution. In this regard we attach no special significance to the fact urged by defendant that the reporter had obtained permission for the interview from the officer exercising custody. Absent evidence of police complicity, the admission of defendant's statement to the reporter infringed no constitutional right nor defeated any purpose fostered by the recent decisions of the United States Supreme Court and of this court.

The statements made to the psychiatrists fall under the rules announced by this court in *In re Spencer* (1965) *post,* p. 400 [46 Cal.Rptr. 753, 406 P.2d 33]. We summarized the *Spencer* ruling in *People* v. *Anderson* (1965) *ante,* pp. 351, 367 [46 Cal.Rptr. 763, 406 P.2d 43], stating, "We held in the most recent *Spencer* case . . . that if the court-appointed psychiatrist may reveal defendant's statements at the guilt trial, defendant should be entitled to the protection of counsel at the psychiatric examination. Yet, in order to avoid the disruption of psychiatric examinations by court-appointed psychiatrists, we established certain safeguards to assure that the courts' refusal to permit the presence of defendant's counsel during such an examination would not involve a constitutional deprivation. Thus we stated that the court-appointed psychiatrists should not be permitted to repeat the defendant's statements at the guilt trial unless the defendant specifically placed his mental condition into issue. Moreover, the trial judge should instruct the jury that the psychiatrist's testimony at the guilt trial which disclosed defendant's statements should be considered only for the purpose of exposing the information upon which the psychiatrist based his opinion and not as evidence of the truth of the statements."

█ In the instant case, defendant specifically raised the issue of his mental capacity to premeditate and deliberate.

Hence the court-appointed psychiatrists could properly testify as to defendant's statements in order to describe their bearing upon his mental condition. In failing to instruct the jury that the psychiatrists' disclosures of defendant's statements may not be considered as evidence of the truth of the statements, the court, however, did not provide the safeguards necessary to justify constitutionally the admission of the psychiatrists' testimony. Accordingly, in the absence of the limiting instruction, the testimony of the court-appointed psychiatrists as to defendant's statements given in the absence of counsel violated defendant's constitutional right to counsel.

We conclude that the prejudicial and incriminating statements made by the defendant to the district attorney on March 18 and March 25, 1963, were improperly admitted into evidence and that the court's failure to give the proper limiting instruction rendered the court-appointed psychiatrists' testimony concerning defendant's statement inadmissible. Accordingly, the judgment is reversed as to each count.

Traynor, C. J., Peters, J., and Tobriner, J., concurred.

SCHAUER, J.,* Dissenting.—One hundred and four years ago this court ruled: "In capital cases, almost every case is appealed. We do not complain of this, even when the grounds of appeal do not present a plausible reason for the reversal of the judgment, since a natural sense of responsibility in the counsel to whose hands the life of a fellow being is confided may well influence him to exhaust every legal resource to save his client from the last penalty of the law. But still it is important that the laws should be enforced, so as to render as certain as possible the conviction of those guilty of their infraction. With every disposition on the part of the Judges to do this, the effort frequently fails, because something is done or omitted which contravenes some arbitrary or technical right of the prisoner. Courts have no power in criminal cases to affirm a judgment, merely because the Judges are persuaded that upon the merits of the case the judgment is right. If any error intervenes in the proceeding, it is presumed to be injurious to the prisoner, and generally he is entitled to a reversal of the judgment, for it is his constitutional privilege to stand upon his strict legal rights, . . . And yet it very often happens that the matter of exception taken by him serves no other

---

*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairman of the Judicial Council.

purpose than to defeat justice.'' (*People* v. *Williams* (1861) 18 Cal. 187, 193-194.) Today's majority decision reaches precisely the same result which would have been reached 104 years ago. Yet in the meantime (in 1911) the People of California in order to preclude such technical reversals added section 4½ to article VI of our Constitution.[1]

In its present form, article VI, section 4½ provides: ''No judgment shall be set aside, or new trial granted, in any case, . . . unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice.'' This court heretofore carefully defined the circumstances under which it could tenably find that there had been a ''miscarriage of justice.'' In *People* v. *Watson* (1956) 46 Cal.2d 818, at page 836 [299 P.2d 243], we held that ''a 'miscarriage of justice' should be declared only when the court, 'after an examination of the entire cause, including the evidence,' is of the 'opinion' that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error.''

The undisputed facts of this case at bench as stated by the majority are as follows: ''On March 15, 1963, defendant . . . entered a service station in the City of Lodi, shot a customer in the leg, and drove off with a Dodge automobile belonging to the station owner. The California Highway Patrol was immediately notified, and Officer Charles Sorensen answered the call. He pursued defendant and his accomplice on Highway 12 at speeds of 85 to 90 miles per hour. During the chase defendant shot at automobiles passing in the opposite direction, apparently hoping to cause an accident and thereby halt Sorensen's pursuit. In Rio Vista defendant crashed the Dodge, and with his accomplice fled on foot through a gate and around the side of a vacant house. Officer Sorensen followed on foot and as he passed through the gate and around the corner of the house defendant fired two shots at close range, killing the officer instantly.

---

[1] As adopted October 10, 1911, section 4½ was limited to ''any criminal case.'' Its salutary effect in stopping reversals on purely technical grounds was so noteworthy that it was amended in 1914 to apply to civil appeals as well as criminal.

For a more complete account of the reasons for action by the electorate in 1911, and the subsequent near full circle retrogression in decisional law, see *People* v. *Modesto* (1963) 59 Cal.2d 722 (dissenting opinion at p. 736 et seq. [31 Cal.Rptr. 225, 382 P.2d 33]); *People* v. *Williams* (1861) 18 Cal. 187, 194; *People* v. *Hines* (1964) 61 Cal.2d 164 (dissenting opinion at pp. 178-179 [37 Cal.Rptr. 622, 390 P.2d 398]).

"Defendant then procured the officer's pistol and with his accomplice took the patrol car and continued west on Highway 12. Deputy Sheriff Hale Humphrey and others, having been alerted, set up a road block of vehicles across the highway. Defendant deliberately drove the patrol car at a speed estimated to have been in excess of 100 miles per hour into the vehicles blocking the road, causing the death of Humphrey."

The majority note that "defendant does not question the sufficiency of the evidence to support the verdict as to each of the crimes. . . . It is argued, however, that the . . . court erred . . . (1) in giving instructions, (2) in denying a motion for a change of venue, (3) in commenting and allowing . . . comment upon defendant's failure to testify . . ., (4) in receiving into evidence . . . incriminating statements made by defendant . . ., and (5) in instructing and allowing evidence . . . on the penalty phase, concerning . . . parole. . . ." Upon what appear to me to be relatively inconsequential (hence, constitutionally untenable) grounds, as hereinafter particularized, the majority reverse the trial court's judgment as to each murder both as to the fixing of the penalty (death) and as to adjudication of guilt.

The majority say that "the state, with commendable forthrightness, concedes that the proceedings contravened the rules later announced by this court in *People* v. *Morse* (1964) 60 Cal.2d 631 [36 Cal.Rptr. 201, 388 P.2d 33], and that the error was prejudicial. (See *People* v. *Hines* (1964) 61 Cal.2d 164 [37 Cal.Rptr. 622, 390 P.2d 398].) A reversal on the penalty phase is thus indicated." The quoted majority statement appears to me to be inadequate in detail and possibly subject to misunderstanding. A mere reading of *Morse* and of *Hines* reveals that *Morse* is not authority for the reversal in *Hines*. In *Morse* the court at length pointed out (see especially pp. 652-653 of 60 Cal.2d) the combination of facts and circumstances from which it expressly and affirmatively found (p. 653) : "after examination of the entire cause, including the evidence, we are of the opinion that it is reasonably probable that a result more favorable to defendant as to penalty would have been reached in the absence of the error." There is no such finding in *Hines*. In marked contrast to *Morse* the court in the *Hines* case says (p. 170 of 61 Cal.2d) : "[1b] Our *sole inquiry* here devolves into a determination of whether substantial error, that is substantial deviation from the standards established in *Morse*, has occurred. We have set forth above the incidents of the errors under the *Morse* test. That the deviations were substantial cannot be seriously questioned.

We *therefore hold* that prejudicial error occurred in the instant penalty trial." (Italics added.) Obviously *Hines* is a gross departure from *Morse*. My views as to the gravity of the constitutional error in *Hines* are definitively stated at pages 175 to 182 of 61 Cal.2d.

In my belief the state is in error in conceding "that the proceedings contravened the rules later announced by this court in *People* v. *Morse,* 60 Cal.2d 631 [36 Cal.Rptr. 201, 388 P.2d 33], and that the error was prejudicial." I am furthermore of the opinion that the majority justices are in error in asserting that "the error was prejudicial. (See *People* v. *Hines,* 61 Cal.2d 164 [37 Cal.Rptr. 622, 390 P.2d 398].) A reversal on the penalty phase is thus indicated." The majority in the circumstances here also transgress what I have understood to be both constitutionally and decisionally established law in stating that "the judgment must be reversed on the guilt phase as well due to the reception into evidence of incriminating statements clearly within the scope of those later denounced by this court in *People* v. *Dorado,* 62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361]."

Such reference to "incriminating statements . . . within the scope of those later denounced" in the *Dorado* majority opinion, is irrelevant to the case at bench. It is irrelevant (if we apply California's Constitution, art. VI, § 4½) because the statements here held to have been improperly received add nothing significant to the eyewitness testimony and the real evidence of circumstances and ultimate facts. The majority opinion concedes that "there is more than sufficient direct evidence as to each of the crimes of which defendant was convicted aside from the statements improperly received into evidence." The stolen automobile, the obviously lethal acts of defendant in the use of that automobile, the dead bodies of his victims, need no confession or admission from defendant to demonstrate that the killings were coldly calculated crimes, perpetrated in deliberate defiance of the law, and intended to destroy the brave officers who gave their lives in support of the law. As Mr. Justice Burke so aptly states in his dissent to *Dorado* (62 Cal.2d at p. 365) the United States Supreme Court in *Escobedo* v. *Illinois* (1964) 378 U.S. 478 [84 S.Ct. 1758, 12 L.Ed.2d 977], upon which *Dorado* assertedly relies, "stresses that each case must be weighed in relation to the totality of its own circumstances."

Furthermore, Justice Burke's dissent in *People* v. *Schader* (1965) 62 Cal.2d 716, 733-735 [44 Cal.Rptr. 193, 401 P.2d

665], pertinently declares: "Under the holding of *Dorado*, the improper admission of such statements and confessions, found to have been voluntarily given, is placed in the same category as the admission of an involuntary confession and the effect upon the jury is deemed prejudicial as a matter of· law compelling reversal. I believe this holding in *Dorado* to have been error and that the prejudice which results from the use of an improperly received *voluntary* confession is not necessarily the same as that which the Supreme Court of the United States has held to result from the use of an *involuntary* confession. . . . Although the admission in evidence of a voluntary confession was held to compel reversal under the particular circumstances present in *Escobedo* v. *Illinois*, 378 U.S. 478 [84 S.Ct. 1758, 12 L.Ed.2d 977] . . ., and *Dorado*, it does not follow that voluntary confessions should be equated with involuntary confessions and admissions irrespective of the circumstance of the particular case."

As Justice Burke further pointed out in his *Schader* dissent (p. 770 of 62 Cal.2d) : "The exact wording of the California Constitution itself (art. I, § 13) is significant: 'In criminal prosecutions, . . . [no] person shall be . . . *compelled* . . . to be a witness against himself; . . .' (Italics added.)

"The compulsory is the antithesis of the voluntary; the voluntary negates compulsion." Surely all the People of California—including police officers—should possess a right correlative to that of an accused to have a voluntary confession of crime considered by judge and jury. But more importantly here—where the incriminating statements of the defendant add nothing of consequence to the certainty or quality or quantum of his guilt—to disregard all direct and overwhelming evidence, and hold that the mere fact that the jury heard his statements must result in automatic reversal of the undoubtedly just judgment of conviction, appears to me to declare a constitutionally impermissible rule of law and to effect a lamentable miscarriage of justice.

The setting aside of a death penalty is, in my view, an even more solemn responsibility than the initial imposition of it. Imposition of the penalty is grave enough; it contemplates taking the life of the guilty transgressor; but that is in order to deter other criminals and thereby save the lives of potential victims. Setting aside such a judgment inevitably tends to weaken the deterrent effect of the law· and thereby to encourage more murders of innocent victims. Regrettably, reversals of judgments in criminal cases—particularly if not

on the merits—tend all too often to weaken respect for the law and the judicial process.

Weighing the entire record in the case at bench as *Escobedo* would have us weigh it—and as the Constitution of this state (art. VI, §§ 4 and 4½) requires us to weigh it—I cannot find ground in fact or in law for doubting that this defendant deliberately murdered California Highway Patrol Officer Charles Sorensen, or that he likewise murdered Deputy Sheriff Hale Humphrey, or that he committed the other crimes of which he was found guilty by a duly impaneled jury. Nor do I find any tenable basis for doubting that defendant was accorded full measure of due process of law, or for believing that any miscarriage of justice occurred in the trial court. The only miscarriage of justice I find in this case is the reversal in this court.

I would affirm the judgments of the trial court in their entirety.

Burke, J., concurred.

McCOMB, J.—I concur in Mr. Justice Schauer's dissenting opinion.

I am aware of no type of error that is recognized by California's Constitution (art. VI, § 4½) as being "necessarily prejudicial" in the sense of *automatically* requiring or permitting reversal of a superior court judgment. Our court has no power to create a ground for *automatic* reversal. In cases wherein the solemn death penalty has been adjudicated—certainly no less imperatively than when other consequences are at stake—the question on appeal must always involve a conclusion of relativity based on the entire record, including the evidence.

This court should not give the semblance of cheapening its function by even an implication that a reversal can be automatic. The issue is important to the defendant because his life is at stake; it is more important to the people of California because their lives are at stake every day and every night, in their jobs, in their homes, and upon the streets, unless potential killers are deterred by fear of the law. They will fear the law only in proportion to the fidelity of its enforcement.